113131, 113153, Keith Lamar v. Mark Houk, Arguments Not To Exceed, 30 minutes per side. Mr. Doughton for appellant, cross-appellee. Good afternoon, Your Honor. I am David Doughton, along with Kate McGarry, representing Keith Lamar. I would like to reserve six minutes for rebuttal. Very well. The case, as the Court is well aware, emanates out of the so-called Lucasville riots from back in April of 1993. In this case, it's important that Mr. Lamar was convicted of five homicides, but all the homicides were based entirely on inmate testimony. There was no physical evidence, no scientific evidence, no DNA, no films, nothing other than inmate testimony. There were eight inmates that testified against Mr. Lamar. He testified. He had an additional five witnesses testify on his behalf. So this came entirely down to the issue of witness credibility. The overriding error in this case is the Brady issue, which pervaded every aspect of the case from the very beginning, from the very pretrials. It started when the defense had requested discovery and requested Brady material, and at first the prosecutor refused to give it. Then, in order to protect witnesses, they came up with a mix-and-match game where they had basically provided in sum 43 names of witnesses and then 11 pages of statements, but wouldn't indicate for the defense which statements went with which defendants. The judge, in fact, went along with this. The judge, in fact, suggested, why don't we throw some names in? Like, okay, this person didn't say anything, so we'll throw his name in. So we had a court-approved discovery, which they found complied with Brady, and obviously we disagree. The problem with this is in the position, I think, of the warden is, well, they had 11 months to, you know, they had an investigator. Excuse me, they had three months. They had an investigator and three months. Why don't you go out and talk to these witnesses? The problem with that approach is we're talking about inmates who were going to come out and provide statements against the prosecution and also statements that would implicate other inmates and understand that the homicides in the Lucasville case were based basically upon the allegations that snitches were killed. How many of those individuals were still incarcerated on that witness list that you were invited to interview? Pardon me? The Brady material, the witnesses you were invited to, by the prosecutor and or the court to go and interview, how many of those people were still incarcerated at that time? They were all incarcerated at that time. Some of them were in protective custody, some of them were not. And in fact, the prosecutor stated at the hearing on this that they had made promises to some of the inmates that they would protect them that were going to be testifying. That in and of itself would be Brady because an inducement to get someone to testify, you know, we're going to protect you and we'll give you, in fact they put them all in Oakwood Institution, would be something that should have been revealed. So we had a situation where it was impossible for the defense counsel to be able to determine which statements went with which person. Well, of course the state says that the way you could have determined that or the defense could have would have been to take up the court on its offer of investigative resources and to go, in fact, speak to the 72 witnesses. That's correct. Why do you think that was not feasible? It wasn't feasible because if you walk into your defense counsel or your investigator and you said, we would like you to testify on Mr. Lamar, here's a list of statements. Did you say any of these? The idea that one of them is going to say, oh, yes, I was the one. I mean, why not just go have a fresh conversation with each of them and see what they have to say? I mean, at the end of the day, you want to know what these 72 witnesses are going to testify to. That's correct. Well, there were hundreds and hundreds of witnesses. Well, at least the ones that the state has identified. Why not just go talk to them? Well, two things. The burden for Brady is on the prosecution. They are under a constitutional obligation to provide the material for the defense. This isn't a situation where you can switch the burden, where they're saying, look, there's Brady stuff out here, and some of it was exculpatory. We're not talking just favorable, but we're talking actual. Here's names. Go find it. That obviates the state from their need to provide it to the defense. There's no cases from the Supreme Court that allow this sort of thing. In fact, the Supreme Court has commented we can't approve it. So basically, under your hypothetical, you're saying the state really doesn't have to. And I know it's hypothetical. I guess I'm not asking about the Brady doctrine per se. I'm asking as a practical matter, why would it have been so much harder for his investigators to talk with these people than it apparently was for the state to talk with them? Two reasons. One, because they had nothing to offer. The witnesses who testified for the state, be it parole board, be it deals to lesser included, had reasons to talk. Second, the defense had nothing. Not only that, but if they did own up to a statement that was given, then you have a situation where they are putting themselves out as a snitch. They are living in the institution, testifying against somebody, not Mr. Lamar, and with nothing in exchange. Your argument is a little bit troublesome in that if the people who gave the statements would have been reluctant to talk because they would be intimidated and placed in jeopardy and all that, it would seem that that same reluctance would apply to them if the state had given you the names and matched names with statements. If they wouldn't submit to an interview with you, it would seem that these people would not want to come into court and testify. Well, what could have been done, whether they want to or not, they could have been subpoenaed to come into court. They could have been brought into court. They could have had a witness for the state set the groundwork. Yes, I interviewed such and such a witness. Yes, I took a statement. And even if what the person said would have been hearsay, they could have then confronted the person. Look, this is a statement. Did you give a statement on this day? Did you say this statement? And so the defense would have had the opportunity to develop it. And the other aspect of this is, you know, they argued materiality or lack of materiality. There is nothing more material than these statements, the reason being the defense in this case was I wasn't there. I was in the yard. He had a couple of witnesses testify that, you know, through this period of time he checked in, but I saw him for an hour and a half in this period he was in the yard. When you have witnesses saying, I saw so-and-so kill Mr. Sveti, for example, and doesn't mention Keith, the fact that he's not identified as being there is the best corroborative evidence that you could have. Well, you don't have a single witness among these 72 who say he was in the wreck yard, right? That's in the record, that's correct. Well, no, there was one. They had the one witness, I forget his name, the defense witness had one that said they looked out for him. Well, I know there were a couple witnesses at trial who testified, but my understanding is that none of the witnesses who are the subject of your Brady claim were people who said, I saw Mr. Lamar in the wreck yard. That wasn't part of the summaries, that's correct. I guess, you know, the concern I have with your argument regarding materiality is here we have a bunch of murderers that undisputedly had multiple participants. And we have, some of these people are saying he did participate. I know you're focused on the ones that said, that didn't mention him. But, you know, why isn't the Ohio Supreme Court right when they say, look, you know, the fact that they mentioned some other participants doesn't exclude by any means the possibility that he also was a participant. Because that's not Brady. Consistent with their theory. Because that's not Brady. What Brady is, if there's favorable evidence, that you're required to provide it to the defense and so the defense can use it if they choose to do so. And then it's a jury question. Well, no, I mean, I'm talking about the materiality. I'm talking about that, because the issue is, was he there? Certainly, if you have, say, 15 statements from people who identify other people as killing the victims and don't mention Keith as being present, then you have a, clearly that's a great weight to the jury that backs up Keith's testimony. He wasn't seen. He wasn't there. The prosecutor's free. This was a totally chaotic situation. Sure it was. It's not like it was three people in a big empty room. I mean, it seems like a stretch to say the state court was being unreasonable in the sense of AEDPA to understand these statements to be fragmentary descriptions of what happened and not necessarily recitations of who participated to the exclusion of Mr. Lamar. And I want to give you a chance to explain why that's wrong. I would be happy to. If I could, I could read a quote from Kyle's, which I think fits perfectly. In Kyle's, they noted that the reason why the prosecutor, if anything, should err on providing is because it will tend to preserve the criminal trial as distinct from the prosecutor's private deliberations as the chosen form for ascertaining the truth. In this case, what the Ohio Supreme Court allowed was for the prosecutor to make determinations of credibility and determinations on strength of evidence. And based on the prosecutor's belief on this, then they didn't have to comply with Brady. They didn't have to turn it over. That's where it goes right up against Kyle's. I understand you'd be really frustrated about that. I don't blame you. But I'm looking at a different part of Brady again. We have to make an assessment about whether we think the trial might have come out differently had he gotten these statements. And I would like to address that. That's not about prosecutorial deliberation. It's whether we have confidence in the outcome, which is the stuff. And here's the problem. The witnesses that did testify, one, the FBI planted a microphone in his head. One said, I couldn't recognize Keith, but I heard his voice. One said he had a T-shirt pulled over his head and admitted that he didn't mention Mr. Lamar's name. But after the Ohio Patrol mentioned his name, he said, oh, yeah, that's probably the guy. So what we have here is hundreds of witnesses that the state trooper has access to all these witnesses. And they're going through. And we have generally the least credible witnesses that you would have in a criminal case. And they're all trying to cut deals from themselves, possibly. And through this, they get a thread that Mr. Lamar is the key suspect. But based on, like, Mr. Bass's testimony, they start suggesting the name to him. So what we have here is a situation where it's all hearsay and it starts spreading. The troopers have complete access to him. And based on the credibility of these witnesses alone, I'm not sure how much credibility or how much confidence he would have in their credibility alone. But then when you mix in that there were, and I'm not even talking about the federal discovery stuff, but then when you mix in there were a number of witnesses talked to and summaries given in which they found other people killing the victims. And don't mention Mr. Lamar. The defense has every right to have access to this because the strength, Giglio is a classic example. And the whole thing in Giglio is, look, when you have a situation where it's based on the strength of the witnesses, it's a different ballgame than when we have a case where there's physical evidence backing it up or DNA backing it up, scientific evidence backing it up. It's a whole different standard. So in this case, the defense had every right to bring in the witness and confront them. Isn't it true that they could say, well, the prosecutor could cross-exam him and say, well, that doesn't mean he wasn't there. He could have been somewhere where you couldn't say, yeah, that's fine, and that's the jury's decision. In the basis of Kyle, the key part of Kyle is that it's the jury. You can't have the prosecutor making credibility determinations. Deciding what a witness says is ridiculous. I suppose if you had a witness that said, I saw Keith Lamar or another person shoot this guy with a machine gun, and it was a beating, maybe at that extreme, it might be proper. But I doubt it. I mean, I think that the whole point of Brady is to make sure that all favorable, all impeaching, all exculpatory is given to the defense in a manner that they can use and provide and present as they see fit. And in this case, it was the prosecutor making the determinations of what was credible and what wasn't. And that's where the Ohio Supreme Court was incorrect and violated, frankly, Brigley and Bagley and the whole litany of cases, Giglio. And I don't think we can have confidence in a verdict based upon this testimony alone when we know all this other stuff is out there. Which brings us to the federal discovery. Which statements would have helped you the most? I think the one most was Mr. Kelly. And I think he testified that one of the victims was killed by the Aryan Brotherhood. And it was revenge for somebody being a snitch against the Aryan Brotherhood. So we have a totally different motive. We have a totally different set of people, which is credible in prison. Because you know, I mean, it's not, I don't think anybody would dispute that there are gangs in prison. And so that Mr. Kelly coming in and having no axe to grind and not putting anywhere was saying, look, this is what happened. You know, this person, I think it was Diana, was involved with something. And we heard the Aryan Brotherhood was involved in it. So that you could, you know, in prison, in the life in prison, which is hard to imagine, but we got a glimpse of it through this, there are all sorts of inside motivations going on, particularly with snitches. So you have an alternative basis for a snitch. And unlike Mr. Lamar, they say he's killing him because of snitches. But there's no evidence that Mr. Lamar was ever snitched on. There's nothing that ties any of these alleged victims for snitching on anything that resulted in Keith suffering any consequences. In Mr. Kelly's testimony, there is. There's a reason, there's a purported statement, and it gives him a basis, a real motive, rather than an imagined motive, which happened here. So it's because someone else had a different motive, that's what Kelly adds? Yeah, Kelly adds that, you know, he was killed by, you know, different people because of snitching against the Aryan Brotherhood. And the fact that there is a, there's no motive with Keith. In Keith's case, he was there and they said, let's get the snitches, but what isn't in the record and wasn't at trial is, why would, what ever came out against Mr. Lamar? I mean, when did anybody snitch against Mr. Lamar? And there was nothing tied, there was no victim that had ever done anything to Mr. Lamar that would give him motives to do this, other than just the general snitching. How does someone else having a motive indicate that? Because it would show to the jury, this wasn't the, you know, the Muslims deciding to have a riot, and I think Mr. Gordon said, and therefore he tells Keith, and Keith warns him, you know, get a bunch of people to come in, and then out of the blue he decides, well I'm going to take advantage of the Muslims having a riot, and I'm going to start willy-nilly killing snitches, and there's no evidence that, why he thought these people were snitches. I mean, there's nothing in the record that these people were snitches. That's the purported reasons given by these inmate witnesses, but there's nothing connecting their actions with Mr. Lamar. How does Kelly's statement undermine that? Well, Kelly, because it gives a viable motive as to why at least one of these peoples would have been killed for a specific reason, not just the general... The fact that there is a specific reason undermines the lack of a... I guess I'm not following the... Well, sure it does. If there's someone other than Mr. Lamar that had a reason to kill the person, I think that's absolutely exculpatory, or at least favorable in this case. And again... It doesn't only have to be exculpatory, it has to be not harmless, correct? Well, that's correct, and the materiality is, you know, huge in this case. Again, we have the Giglio standard of you have somebody who... It's based entirely upon inmate credibility. There's nothing else that ties Keith to the case. And I see that I'm not... Just to reiterate, when you were denied the Brady material wrongfully, as you say, what did the defense do to avail itself of the Brady material by way of investigation, interviews, or really any efforts whatsoever? Did you do anything? Once it was discovered, it wasn't discovered who said what until the subsequent trial. Mr. Matthews and Mr. Kanin were tried afterwards, and in that case, obviously, the prosecutor had second thoughts about the procedure, and he did tie up the statements with a particular person. When they found out, they filed two new trial motions, you know, saying, look, this is what we would have done, and then they kept trickling stuff in. They were supplementing their new trial motion through the trial, and they filed a second new trial motion in which they said, here's what we would have done. They didn't do anything at trial because, obviously, they didn't have the person declarant who had made the favorable statement. So at some point, the statements and the individual names were... Yes. When did you say that occurred? After Mr. Lamar's trial, there are two other people tried for the same killings, Mr. Matthews and Mr. Kanin. In the pretrial motions for those trials, they did tie up the names of the declarant with what was said, and when Counsel for Lamar discovered this, they immediately filed for a new trial motion. And then they found out other information as it came on, and they filed for a second new trial motion, which was denied in state court, but in the new trial motions... Oh, this is after the conviction? This is after the conviction, yes. Okay, well, back up some. When you were given the names and the statements or the summaries of statements, at that time, initially, what did you do to try to obtain these statements, interview witnesses, or investigate these people whose names were provided at that time? Well, my understanding from the record is that they started to and found it futile, but they didn't follow up on every name. They didn't go talk to every one of the 43 names. You're talking about defense counsel? Yes, I'm talking about defense counsel. How many did they talk to? I don't know that answer from the record. I don't know. Isn't that an important thing to know? No, I don't... Even if we agree with your argument, wouldn't we want to know the answer to that? But here's the problem, as I said before. In the hypothetical that you present, what is being said is it's not the prosecutor who has the duty to provide the evidence of the defense. They just have to throw crumbs and have the defense go get it. I mean, it's like the cases when you put... It used to be 4,000 pages of discovery and you have something exculpatory in one page and defense go find it. But they're arguing, as I understand it, that the information was not... The information might be otherwise available to you and that somehow lessened their Brady obligation. Now, I know you disagree with that. I'm not saying that... I'm not saying what the bench here thinks about that, but just to get at that argument, it would be nice to see what efforts were expended by the defense. But I think I have your answer, so... Thank you very much. May it please the court. Where the state court concluded that Lamar's application to reopen his direct appeal was untimely filed, the district court was correct in observing that if Lopez and Pace's case names applied to Lamar's petition, Lamar would not be entitled to statutory tolling. However, the district court erred as a matter of law in applying the Chevron oil balancing test to conclude that Lopez and Pace did not retroactively apply to Lamar's petition, where the Harper rule of retroactivity clearly supplanted the Chevron oil balancing test. This court should reverse the district court on the statute of limitations matter and determine that Lamar's petition was not timely filed. Also... I mean, one can hardly blame him for relying upon existing precedent in this court. So why isn't he entitled to equitable tolling under Holland, which would make his petition timely? Specifically, Your Honor, the two-word answer to that... Take as many as you want. The three-word answer to that question is lack of diligence. Okay. Well, he files the thing, what, five days after... I forget which event in the procedural history. His petition surely would have been timely had our court not thereafter reversed itself as to... I forget which case it was. You know the one I'm talking about. Yes, Your Honor. So, I mean, when he filed it, he had every reason to think, under our own precedent, that it was timely. And so, I mean, why should we penalize... Why shouldn't we grant equitable tolling to somebody who relies on our precedents to think that their petition is timely? Your Honor, and I'll answer that question to begin with this. To be clear, Judge Kethledge, the warden does not dispute that at the time Lamar filed his petition, circuit precedent allowed Lamar to conclude that the filing of any sort of application to reopen direct appeal with state court would be an act that wouldn't click off the statute. That was pursuant to circuit precedent. We're not disputing that. As a matter of fact, Magistrate Murs made that very conclusion. So, we're not disputing that point. It changes after he... That is correct. Now, the second step, and this is, I believe, it's important to keep in mind in terms of equitable tolling about circuit precedent, the magistrate on that topic also concluded that because of the dynamics of that question of law as it was percolating through eventually to be reversed by Lopez v. Wilson, the magistrate, who is a habeas capital expert if there ever was one... We're here to review his work. Yes, exactly. But he concluded that a habeas capital practitioner would have discerned from the nature of the... Which way the wind was blowing? Correct. That's a pretty tough standard. I mean, we've got to be able to follow our precedents. You know, say that they should have known that our precedent was going to be tossed out before we did it. Isn't that asking an awful lot of a litigant? And, Your Honor, if that was the only thing the warden was relying on, I would agree with you 100%. Can I ask, just before you go on to intersperse one issue, were there other cases, though, that distinguished Bronau and said that... and ruled... and anticipated Lopez, but just were argued not to have sufficiently or some judges said they didn't distinguish or couldn't overrule Bronau and others said it was different from Bronau? Your Honor, the circuit precedent, which by virtuous circuit rules, Bronau was the lead case. However, there were other circuit... Was it a statute of limitations case or it was? Pardon, Your Honor? Was it a statute of limitations case, Bronau? Yes. Well, Bronau was the case that said, as far as Ohio was concerned, an application to reopen direct appeal was part of the direct appeal itself. Therefore, it caused an application to reopen direct appeal to be some type of tolling event since the statute was allowed a one-year term from conclusion of direct appeal. Bronau said direct appeal was not over until an application to reopen direct appeal was filed and adjudicated. That was subsequently undone by Lopez v. Wilson, but there were other panels in between time that said we disagree with the Bronau and find some reason to distinguish it, which caused the magistrate at the district court level to conclude in an R&R that a habeas practitioner in the capital field would have known that Bronau was on shaky ground, meaning that there was another procedure. Basically, you file the petition and ask for a stay in the bay is all it would have to do. It's not a layoff though, getting that, right? I mean, that's not granted as a matter of course by the district court. You have to show good cause, right, for why you didn't exhaust something? Your Honor, I don't disagree with you. Now, there is three cases from this court that are reported in the appellee's brief. I believe the case names, first names, Henderson, Johnson, and Sherwood, where this court has said, and correctly so, that where a habeas petitioner has justifiably relied on circuit precedent that was subsequently overruled, and this is the key point, but they were diligent. They were diligent in pursuit... How was he not diligent? How was your opponent not diligent? The timeline will suggest this, Your Honor. The application to reopen direct appeal that was filed with the 4th District State Court of Appeals was filed on August 11, 2004, which was more than almost five years past the 4th District Court of Appeals' decision. The 26B procedure in the state of Ohio said a timely 26B would be within 90 days. If you file outside that, submit an affidavit for good cause for the delay, and in this case, the 26B application to reopen appeal was filed more than four and a half years late. There's a reason to deny that application, but the delay you're talking about is delay in the state courts, right? That is correct. Why isn't that simply a reason for state courts to refuse to adjudicate things in state court that are untimely, but not something that we would consider in determining whether to adjudicate a federal habeas petition? Your Honor, the specific answer to that question would be that the warden's position is that Johnson v. United States, 544 U.S. 295-2005, which defines due diligence as prompt action on the part of the petitioner as soon as he is in a position to realize he has an interest in challenging a pertinent state court determination would mean that for equitable tolling purposes, state activity and federal activity are looked at together, not just federal activity, but it would be state and federal activity. That's the warden's position. It would come out of Johnson v. United States. The warden would also point out that in this court's analysis of these three cases, Henderson, Johnson, and Sherwood, where this court determined that reasonable reliance on overruled circuit precedent justified equitable tolling, there was in those three cases a diligence analysis that included, as I read the case, included diligence on the state side, not just the federal side. But the warden's position is because this court in the Henderson, Johnson, and Sherwood case went to the extra effort of engaging in a diligence analysis, it would lead the warden to conclude that this court has determined that in order to be entitled to equitable tolling for justifiable reliance on overruled circuit precedent, the petitioner also has to be diligent in state and federal court. The warden's position is in this case that Lamar was not diligent in state court. He slumbered on his rights for near four and a half years, and obviously the affidavit for just cause to excuse the delay was rejected not only by the Fourth District Court of Appeals but by the Ohio Supreme Court because the affidavit to excuse the delay essentially was a finger pointing that other attorneys should have done something, didn't do something, and that excuse was not justifiable for the lack of diligence. So the warden's position is... You know, in deciding whether to agree with your argument or not, wouldn't we be inclined to do a Teague versus Lane analysis of the change in the law to determine if there was a fundamental constitutional right that had been affected and base our analysis in part on that if we take into account all of the requirements of Teague versus Lane? Your Honor, I would disagree that Teague would be the appropriate case. I believe the appropriate case for that type of analysis would be Harper v. Virginia Department of Taxation, 509 U.S. 86, 1993. And the Harper case concluded that full retroactive effect is to happen in all cases, civil cases, which this is what habeas corpus is. And I believe that this court in... would look at whether we are dealing with a collateral remedy as opposed to direct review and also what the interest in deciding that the judgment is entitled to repose looking at the constitutional magnitude of the interest at stake. So the Teague versus Lane analysis is quite a bit different from Harper. And maybe Teague would be inappropriate, but I haven't heard why that would be so. I don't think that case was really briefed by the parties here to any degree. Your Honor, in response to that, the question before the court is a question of federal statutory interpretation of 2244D. It's a federal statute of limitations question. And I am not aware of a circumstance where Teague would be called on to analyze a question of what does the federal statutory tolling for habeas corpus petitions mean and then the concomitant question about equitable tolling where a petition is statutorily untimely. So that is where... Harper is a case that speaks to civil litigation. A habeas petition is in fact civil litigation. And the question is relative to 2244D, a federal statute of limitations question. So consequently, even in terms of whether the question is on direct review... What we are discussing has nothing to do with the merits or demerits of the habeas petition. I hate to interrupt you, but even though habeas is civil in nature, doesn't this In re Masio case from the Sixth Circuit apply to Teague analysis to new rules of criminal procedure to some extent? Your Honor, I am not familiar with that case, but the warden's position is the question before the court at this present time has nothing to do with criminal adjudication or a criminal claim. It doesn't really even have anything to do with any of the habeas claims. It has everything to do with whether or not a habeas petition generically is or is not timely. And under that analysis, cases that discuss such as Teague, whether or not... But is the issue all that simple? If we're trying to determine if it was timely, we have to decide if we're looking at a matter on direct review or these are collateral proceedings and what the constitutional magnitude of the interest involved. I'm just not sure it's as simple as you're making it. Your Honor, if I could respond to that, I will say that the question of equitable tolling, if in fact the court doesn't get to the question of equitable tolling unless it determines, which the warden believes it should, that this case was statutorily untimely. If this court determines that the petition was timely filed pursuant to the statute, there's no reason to even discuss equitable tolling because it's statutorily timely. But the warden's position is it's statutorily untimely for the reasons expressed in the brief. With that being said then, the next step relative to questions of equitable tolling, I think a key buzzword there is equity. And the warden certainly would say that if this court is sitting as a court of equity, it's entitled to factor in whatever circumstances it deems to be equitable. That gets back to how long it took to progress through the state. Your Honor, that's what I'm getting back to. So that's it. That's what I got. Certainly. Are you going to address the Brady issue? Yes, sir. In reference to the Brady question, I think it's important to keep in mind, first I'd like to say that the warden's analysis is exactly consistent with Judge Kethledge. I think the analysis that it seemed that you were engaging in in terms of your questioning, not to say how the court's going to come out, but the analysis, the questioning that you were giving is consistent with the warden's position. Now, with that being said, factually, I think it's important to keep in mind, and this is actually getting back to the series of questions that Judge Kethledge asked. You begin with there's about 400 inmates in L6 during the riot. Actually, there was a number of inmates who were actually compensated by the state from a lawsuit under a theory of failure to protect. Actually, anecdotally, the state paid $4 million to a group of inmates who sued that were confined back in L6. Was this related to the mix and match? Your Honor, there was 400 inmates. I understand there were 400 inmates. What about the mix and match issue? Out of that 400, three months before the start of the trial, the state provided the defense with a list of, I believe it's 76 names, essentially saying of all the inmates that were behind the walls during the riot that were not under the control of the state of Ohio but were in some measure behind the walls at the riot, here are 76 names. You're saying they narrowed it down from 476. That is correct. That's the warden's position. They didn't narrow it down any further, so the fact that they narrowed it down before doesn't really address their argument. Well, Your Honor, the warden's... I wonder what your answer is to their argument. They have an argument. It makes a certain amount of sense. I wonder what your answer to it is. The argument is, you gave us a bunch of names and a bunch of statements, and you didn't connect them. And so it wasn't very useful. And at some level of abstraction, it's got to be true that just giving people information without connecting it is going to be useless. They're saying, you reached that here. You gave us 76 names, or however many, and you gave us 40 statements, or however many, and it isn't even the statements. It's the summaries of the statements, and then said, go to it, you figure out the rest. That seems to be the nature of their argument. What's the answer to that? The answer is, Your Honor, that since the information was in the possession of the defense three months prior to trial, along with an extra $5,000 for investigators' fees... Why not just give it to them, then? I don't understand. Your Honor, the rationale that was provided by the prosecutors at the time of the disclosure was that there was security issues concerned. So it would be insecure for them to have certain information? Your Honor, that was the rationale that was provided. But they could get that information. So how is it helping security, just to make it harder for them to get the information that they were getting? Well, Your Honor... If we want you to get the information, we just want you to have a hard time getting it, or we don't want you to get the information. Your Honor, the warden's position is that a Brady violation initially requires a suppression of evidence. That in this case, there was not a... But you must say that camouflaging it at some point becomes suppression. And they couldn't put all the words in alphabetical order and say, you've got the words, now put them together. I mean, that'd be absurd. Your Honor, the warden's position is there was a mix-and-match game. That's not disputed. It's never been disputed. There was a list of names and a list of statements. A mix-and-match is total obfuscation. I'm not saying this was, but at some point it would be, right? And, Your Honor, I'm not disputing that proposition either. So there was really no good reason for obscuring it. You're just saying it wasn't such a bad obscuration. Is that the idea? Your Honor, what I'm saying is that the disclosures took place 3 months before trial with an additional $5,000 worth of investigative fees, and the defense was not in any way precluded from narrowing down a list... They obscured it and then gave them the tools to uncover the obscuring. And that may not be... Apart from whether that's a violation, why would you do that? Your Honor, the answer to that question, as provided by the prosecutors at the time of this hearing... You're not defending it. The rationale provided was it was for inmate security. But you're not defending that. Your Honor, I'm not attempting to defend or not defend. That's what I'm asking. You're not defending it. You're just saying that's what they did and we just got to see what... That's part of the state court record, and the state of Ohio was within reasonable bounds. I thought Brady was a little more simple than this. I thought if the prosecution possesses evidence favorable to the defense, they have to give it to the defense, period. Not this sort of, well, if we think we have a security reason or some other good reason, we're going to just give some fragmentary information, but we're not going to give the actual exculpatory or semi-exculpatory statement we have. I mean, what case would the state point to for the proposition that Brady has an exception that would allow the state to withhold those... Let's talk just about the statements that the state had. Forget about what's in the witnesses' heads. The statements, they have some statements that supposedly are somewhat exculpatory. What case does the state point to that lets the state not provide that statement to the defense? O'Hara v. Bergano, 499, F3D, 492, 6th Circuit, 2007, quote, Brady generally does not apply to a delayed disclosure of exculpatory information, but only to a complete failure to disclose. That's the case we would point to. I understand what you're arguing. In addition, Your Honor, the case of Owens v. Guida, 549, F3D, 399, 6th Circuit, 2008, stands for the proposition that if the evidence in question is not wholly within the control of the prosecution, which actually, Your Honor, the evidence, if you're talking about evidence in court, it's actually sitting inside the inmate's head. Well, I mean, one could argue that the statements that the prosecution had, the 72 statements that were not provided, that those themselves could have evidentiary value because you could impeach a witness who testifies contrary to a statement at trial, but they never get those statements. They have to go off and sort of, you know... I mean, they didn't do it, but they'd have to go off and try to question these people themselves. And, Your Honor, the warden's position is the state of Ohio was within reasonable bounds to conclude that did not amount to a Brady violation. It's perhaps not the clearest, friendliest-type resolution, but it's within bounds. So there was an opportunity afforded. Different circumstances make different cases. If this was perhaps the EVA trial, this was two days before, where there was no opportunity whatsoever, and we would also like to point out... Is that how the state court ruled? Is that how the state court reasoned in dealing with this issue? In respect to what, Your Honor? In respect to AEDPA, is that how the state court ruled? Is that what the state court's analysis was, what you just said? Well, this was a merits determination by the Ohio Supreme Court, and the Ohio Supreme Court concluded that this is good enough to give this information, to have 90 days, to have investigators' fees. So your answer is yes, then? Yes. Um, so... So, I mean, what would you have to say in response to Mr. Doughton's point on materiality, that this was a case where, you know, there wasn't physical evidence, it was the credibility of the prosecution's witnesses against that of the defense witnesses, and introducing into the mix a number of people who purportedly would say that they saw other people committing the murders might tip the balance of credibility in the defense's favor? What's your answer on materiality? The very short answer is, Lamar's defense was alibi. Mm-hmm. Because what the jury heard from the defense, which Mr. Lamar did not have to put on a defense case, but part of what the jury analyzed was Lamar's defense that, I wasn't even there. Not at all. And, as the court, Judge Kethledge, pointed out in its questioning, none of the disputed statements took Mr. Lamar out of the L6 area, which would have been consistent with his defense. So the very short answer on materiality is, there was no statements that would And I'm out of time. Yes, Your Honor, thank you. Thank you. I'm going to answer some questions in regard to the Brady and the opportunity to investigate. One of the statements mentioned here was they had $5,000. At $100 an hour, that's 50 hours. You have one week. What we haven't addressed yet today is, and that's for the complete investigation. I've seen other stuff saying, we'll give you all the resources you want. And what happened was, at the evidentiary hearing in this case, and I know there's an issue of pinholster, whether that's relevant. Well, it's what you would call the Supreme Court decision. We have to... No, I understand. Because defense counsel did, in fact, address that at the evidentiary hearing. And what he said is, we tried and tried, and we kept going up against a brick wall. And after we finally got to the point, it was a waste of our resources because we got no answers. You know the rule. No, I understand. Which is why I answered the way I did the first time I was up here. Again, the difference is, when you ask, was there a Supreme Court or allowed this sort of thing? No, because the Supreme Court decisions say you can't play that game. It's got to be straightforward. They cited a Sixth Circuit case, which said if there's a delay, then it's fine as long as you give it in time and as long as it was complete. The whole argument here is, the way in which it was done, it was never provided. It was tantamount to a deprivation. It was even worse. It was holding the carrot out in front of the dog and not letting him catch it because you know there's something that's out there that can help you, but you can never use it. You can't find it. It's even more frustrating what's going on. And again, the problem here is that the trial judge went along with this. The trial judge actually assisted in the names and how to format this so that the state court finding, when the Supreme Court said, that's fine, they found that this procedure was compliance with Brady. And that's where it's wrong. That's where it's totally an unreasonable application of Brady and particularly of Kiles. The last point that I would like to make is in relation to the Holland case. This wasn't a case where it was four and a half years before he filed. At this time when Keith did his cases, there was an appellate decision. And then we got put in a position where it had to be 90 days, the Murnihan had to be 90 days from the appellate decision. So he would have had to have raised ineffective assistance on the same counsel who were representing him to the Supreme Court of Ohio. So during this four and a half years, there was direct appeal litigation, timely, that was going on throughout this entire time. When the cert petition was over, counsel had a situation aware of Branaugh. And in fact, Murnihan counsel had said, actually advised Mr. Lamar, look, Branaugh's out there. There was a dispute over who was going to file it. Was it the Ohio Public Defenders? Was it the people that were assigned? They weren't going to get paid. So once it came out, Holland says there can't be a delay in the filing of the habeas petition. There's no mention in Holland whatsoever with any delay in state courts. And everything in state court outside of the 26B was timely filed. There was litigation going out throughout this period of time. How do you respond to Mr. Mayer's point that the Johnson case and the three cases he mentioned, Henderson, Johnson, Sherwood, all look to the petitioner's diligence with respect to state filings in determining whether he's entitled to equitable tolling? We had this issue in John Drummond. And in White v. Woodall, the Supreme Court came back unequivocally and says, look, you can't look to circuit court decisions as a way to change our holdings. It has to be Supreme Court holdings altogether. You've got a Supreme Court case, Johnson v. United States, that Mr. Mayer referred to where he says that they looked at timeliness in state court as well as federal. Well, that flies in the face of Holland because Holland clearly says it's the petition habeas et al. However, my answer to that, there was no lack of diligence in state court. That, again, throughout this entire procedure, there was timely, pending, direct appeal litigation going on. And when it was over, habeas counsel who was appointed six months later had a choice. We can depend on Branaugh, and then if it's done, which it was, we presented this case to the district court in its entirety. All the issues were done. It was all exhausted. There was no reason for stay and obey, which is not automatic. And so it was presented in its entirety, not piecemeal litigation, to the court, which would seem to be the reasonable way to do it, especially at that time when you're dependent upon circuit precedent. So based on that, the decision was eminently reasonable by counsel and certainly is not any type of undue delay for the filing of the petition and, frankly, for the Murnihan itself, because it was filed within a year of when the United States Supreme Court decision was. So we're not talking about an extremely lengthy time. Thank you very much. Thank you. And the case is submitted.